## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
## HOUSTON DIVISION

| | | |
|---|---|---|
| **Deana Pollard Sacks,** | § | |
| *Plaintiff* | § | |
| | § | |
| **vs** | § | **Civil Action No. _____** |
| | § | **JURY TRIAL DEMANDED** |
| **Texas Southern University, James** | § | |
| **Douglas, Fernando Colon-Navarro,** | § | |
| **April Walker, Ana Otero, Ahunanya** | § | |
| **Anga, and Darnell Weeden,** | | |
| *Defendants* | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

## I.     INTRODUCTION

Professor Deana Pollard Sacks is a renowned scholar and tirelessly devoted teacher.  She was among the most decorated and published professors at the Thurgood Marshall School of Law ("TMSL") at Texas Southern University ("TSU") and routinely donated her time to review sessions and after-hours study sessions to help students.  She created original teaching materials for her students and drafted model questions and answers for the California State Bar.  She drafted/reviewed proposed new legislation for legislators voluntarily upon request and provided legal counsel free of charge while consistently producing top-rated legal scholarship and gained a top 10% rank in SSRN's international ranking of scholars.  Her student teaching evaluations were extremely positive over 20 years

of teaching.  Plaintiff worked very hard, fulfilled her contract duties, and exceeded all TSU expectations.

Despite Professor Sacks's accolades and commitment, she is the latest in a long line of TSU educators who have been targeted and discriminated against based on their race and gender.  A group of nonwhite TMSL professors, many of whom attended TMSL law school themselves, have used their official positions at the law school to violate clearly established constitutional and federal statutory law prohibiting racial and gender discrimination and harassment and have done so maliciously based on personal animus against whites and/or women and in retaliation for Plaintiff's (and others') valid civil rights complaints.  TSU's and the individual defendants' misconduct forced the Plaintiff (and other whites and females) to resign in 2020 and the Plaintiff seeks damages for constructive termination.

TSU and the individual defendants named herein operated intentionally, maliciously, and in concert under color of state law.  While exercising official law school functions as deans, administrators, or law school voting faculty/committee members, all individual defendants violated clearly established law by, *inter alia*:

1. Withholding tens of thousands of dollars from Plaintiff's paychecks and failing and refusing to pay Plaintiff in accordance with compensation promised to her on TSU's official letter head (in the

salary letters), in breach of a written employment contract and in violation of the Fair Labor Standards Act (FLSA) and the Equal Pay Act (EPA), 29 USC Section 206(d)(3).  The withholding of wages exacerbated after Plaintiff complained about unequal pay and racial and gender harassment.  Over $20,000.00 was withheld from the Plaintiff's wages in 2017 after Plaintiff filed her first EEOC Charge in February 2017, while Defendant Douglas was the law school dean.  This withholding of wages caused secondary damages as well because retirement fund contributions are a percentage (13%) of the paychecks and Plaintiff lost both a portion of the full 13% contributions *and retirement fund growth* as a result of the unlawful wage withholding during a bull market.  Other white females also were subject to unlawful wage withholding and/or false IRS documents created by TSU and had to spend time dealing with TSU as a result, which is very time consuming and part of TSU's modus operandi to force females to resign by means of "exhaustion harassment."  TMSL has a long history of overworking women to the point of physical and mental exhaustion while providing men with light workloads and much higher compensation.  This is part of TMSL's history and culture.

2.      Using official law school committee processes to manipulate a failed-out law student into making a false discrimination complaint against the Plaintiff as a last-ditch effort to remain in law school despite "no evidence"[1] to support the discrimination allegation.  This was the first student complaint against Plaintiff in 16 years of teaching and came on the heels of Plaintiff's first gender- and race-based pay discrimination complaint submitted to TMSL administration (Dean Holley).  TMSL's ridiculous policy provided that the only opportunity a failed-out law student had for remaining in law school where no calculation error was made in the student's grade was to assert discrimination and attempt to get a grade change upon a finding of a professor's discrimination against the student.  On information, Colon encouraged the failed-out law student to lodge a complaint against the Plaintiff as part of his ongoing harassment of the Plaintiff that rendered him being a defendant in this case.  Colon instigated the student complaint against the Plaintiff and aided and abetted the committee in making a false recommendation of discrimination against the Plaintiff.

---

[1] The law school dean determined there was "no evidence" supporting Defendant Otero and her committee's recommendation to find that the Plaintiff discriminated against the student, in part because all of Plaintiff's exams are blind graded.  Ironically, Otero is a "professor" of evidence and apparently did not know the difference between admissible evidence and no evidence.

3.      The committee members, including individual defendants Otero, Anga, and Walker misused their official TSU committee voting power and voted for a finding of discrimination against Plaintiff despite "no evidence" of discrimination as Dean Holley ultimately found when he refused to adopt the committee recommendation to make a false finding of discrimination against the Plaintiff.  A finding of discrimination against the Plaintiff is grounds for termination pursuant to a TSU employee policy manual, which put the committee in the position of threatening Plaintiff with job termination and possibly terminating her if the dean had gone along with their baseless recommendation of a finding of discrimination.

4.      For many years, creating false official annual pay data by underreporting the male professors' total compensation by up to $68,000.00 per year for the purpose of hiding the blatant Equal Pay Act violations and defeating Plaintiff's (and other women's) gender-based unequal pay complaints.

5.      Harassing the Plaintiff and other members of the Gender Equity Committee that was formed in early 2017 by then-dean Defendant Douglas in response to the ABA's finding that TMSL was "persistent" in refusing to acknowledge or investigate dozens of sexual

harassment, sexual assault, gender discrimination and harassment, and unequal pay complaints, which violates ABA accreditation standards (ultimately the ABA assessed a public censure against the law school and a $15,000.00 fine for its "persistent" refusal to follow the ABA standards and the many laws prohibiting sexual harassment, gender-based pay disparity, and other forms of gender discrimination).

6.      Retaliating against employees who complain, including Plaintiff, and forcing them to resign due to intolerable working conditions arising from physically aggressive, harassing, and malicious violations of Title VII, the Equal Pay Act, 42 USC Section 1981, the Constitution, and the Fair Labor Standards Act, 29 USC Section 206(d) & 215(a)(3).

7.      TSU's ongoing failure to pay women equal to men and other ongoing harassing and discriminatory practices demonstrate that TSU will persist in blatantly violating the law, falsifying the pay data, and abusing whites and females to the point of forcing them to resign. TSU's refusal to abide by civil rights laws and decision to ignore the many EEOC complaints and lawsuits arising from the violations per se supports Plaintiff's constructive termination claim because the law is settled that persistent and ongoing civil rights violations perpetrated

by an employer post complaint gives an employee the right to resign and seek damages for constructive termination.

8.      In this case, Plaintiff will prove that she discovered the depth and breadth of TSU's discriminatory practices and corruption in the months leading up to her termination in 2020, when it became clear that TSU and TMSL intended to continue its blatant Equal Pay Act and other civil rights violations despite ongoing litigation and evidence produced in *Sacks v. TSU I* shows that TSU has been falsifying and underreporting men's wages for many years to hide its EPA violations. In addition, the Plaintiff will also show that the work environment had become so intensely abusive, harassing, and discriminatory that it was intolerable.   Indeed, three white females referred to the environment at TMSL as "abusive" and "intolerable" in *Sacks v. TSU I*[2] (the evidence is on file with the Court).   All three white females resigned as a result.

All defendants had actual knowledge of federal anti-discrimination laws as employees of an HBCU or had constructive knowledge that their actions violated clearly established federal and constitutional law.  The individual defendants are personally liable for the retaliatory and civil rights violations pursuant to 42 USC

---

[2] Civil Action 4:18-cv-03563 (S.D. Texas, Judge Ewing Werlein).

Sec. 1983 and 29 USC Section 215(a)(3). TSU is vicariously liable under Title VII of the Civil Rights Act of 1964 and other laws. This is a case of constructive termination for lost pay, health and retirement benefits, and other damages against TSU and individual defendants who are or were TSU employees at the times of their misconduct.[3] Damages for constructive termination are recoverable against TSU under Title VII and 29 USC Section 215(a)(3). Damages for constructive termination against the individual defendants are recoverable pursuant to 29 USC Section 215(a)(3) and 42 USC Section 1983, both of which also support an award of punitive damages against the individual defendants. TSU is also liable for breach of written employment contract.

## II.    JURISDICTION AND VENUE

1.    This is a district of proper venue. Plaintiff was employed by TSU in Harris County, Texas, and many of the discriminatory acts occurred there. TSU has its headquarters and management in Harris County, Texas.

2.    Venue is proper in this district under 28 U.S.C. § 1391 in that a substantial part of the events or omissions giving rise to the claim occurred in

---

[3] This case, *Sacks v. TSU* II, was necessitated by the fact that the trial court refused to allow Plaintiff to amend her pleadings in *Sacks v. TSU* I to allege constructive termination and Plaintiff is unclear whether the court will entertain constructive termination as part of the pending Equal Pay Act claim in *Sacks v. TSU* I. Plaintiff had to file this case to preserve her rights because the EEOC Right to Sue letter was issued and Plaintiff did not want to miss the filing deadline. In addition, the trial court erroneously dismissed the individual defendants in *Sacks v. TSU* I.

Harris County, Texas. Venue in Harris County is provided by the Texas Education Code, Section 106.38.

3.     This case is brought under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq., 42 U.S.C. § 1981, 42 U.S.C. § 1983, the Fair Labor Standards Act/Equal Pay Act, 29 U.S.C. Section 206(d)(1) & 215(a)(3), (29 C.F.R. § 1620 et seq.), and Texas common law.  This Court has jurisdiction concerning the federal claims pursuant to 28 U.S.C. § 1331.  This Court has jurisdiction concerning the breach of contract claim pursuant to 28 U.S.C. § 1367.

4.     Plaintiff has exhausted all administrative filing prerequisites.  She timely filed a notice with the Equal Employment Opportunity in August 2020 and received a right-to-sue letter dated November 10, 2021, less than 90 days before this lawsuit was filed.

## III.   PARTIES

5.     Plaintiff Deana Pollard Sacks is a Caucasian woman residing in Houston, Harris County, Texas.  Professor Sacks devoted 20 years of her life to the development of Texas Southern University's Thurgood Marshall School of Law, 2000-2020.  She was a full, tenured professor of law until August 10, 2020, and has a very unusual set of skills that render it very difficult to find a comparable position.  She has been unemployed or underemployed since August 10, 2020, despite her diligence in continuing to produce top-notch scholarship and other

academic writings and educational radio shows, and earnestly seeking employment to cover her job loss at TSU.  Her lost compensation at the time this lawsuit was filed are approximately $300,000.00.

6.     Defendant Texas Southern University is a coeducational statewide institution of higher education located in Houston, Harris County, Texas. TSU controls and operates TMSL.  It may be served by serving its President, Dr. Lesia L. Crumpton-Young, 3100 Cleburne St., Hannah Hall, Suite 220, Houston, Texas 77004, as set forth in the Texas Education Code, Section 106.38.

7.     Defendant James Douglas (hereinafter "Douglas") is a Distinguished Professor of Law at TMSL and has served as the law school dean or TSU university president intermittently for nearly half a century.  Defendant Douglas is being sued in his <u>personal and official capacities</u>**.**  Defendant Douglas can be served at his residence or at his office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

8.     Defendant Fernando Colon-Navarro (hereinafter "Colon") is a former law school associate dean and is currently a Professor of Law and Director of L.L.M. & Immigration Development at TMSL.  Defendant Colon is being sued in his <u>personal and official capacities</u>.  Defendant Colon-Navarro is being sued in his individual and official capacities. Defendant Colon-Navarro can be served at his

residence or at his office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

9.     Defendant April Walker (hereinafter "Walker") is currently a Professor of Law at TMSL and was formerly Douglas's girlfriend.  Defendant Walker is being sued in her personal and official capacities.  Defendant Walker can be served at her residence or at her office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

10.     Defendant Ana Otero (hereinafter "Otero) is currently a Professor of Law at TMSL.   Defendant Otero is being sued in her personal and official capacities.  Defendant Otero can be served at her residence or at her office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

11.     Defendant Ahunanya Anga (hereinafter "Anga") is currently a Professor of Law at TMSL.  Defendant Anga is being sued in her personal and official capacities.  Defendant Anga can be served at her residence or at her office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

12.     Defendant Darnell Weeden (hereinafter "Weeden") is a former associate dean (on and off) and is currently a Professor of Law at TMSL. Defendant Weeden is being sued in his personal and official capacities.  Defendant Weeden can be served at his residence or at his office in the law school, Texas Southern University, 3100 Cleburne, Houston, Texas.

13.     Defendants Douglas, Colon, Walker, Otero, Anga, and Weeden (hereinafter "Individual Defendants") are, or were during relevant times herein, administrators, directors, or professors at TSU/TMSL and exercised state-delegated power over the Plaintiff's wages and other employment benefits.  The Individual Defendants are all nonwhite and acted in concert to further their malicious, gender-biased, and racist agenda which they knew, violated clearly established constitutional and federal civil rights laws prohibiting discrimination and harassment based on race or gender.  The clearly established laws include the Fair Labor Standards Act (FLSA), the Equal Pay Act (EPA), Title VII, the Due Process Clause, the Equal Protection Clause, and 42 USC Section 1981.

14.     Some of the Individual Defendants acted out of sheer hatred for whites, and some have referred to whites as "white bitch," "fucking whites" and "fucking white people" inside of the law school in earshot of the Plaintiff, students, and other TSU employees. An enormous amount of admissible evidence showing their malicious gender bias and racism will support punitive damages at trial.

## IV.   STATEMENT OF FACTS

### A.    TSU's Long History of Civil Rights Violations

15.     TSU is a historically black college or university ("HBCU") with a long history of racial and sexual discrimination and harassment.  TSU's law school, the Thurgood Marshall School of Law (TMSL) was established in 1946 by

the Texas Legislature to provide opportunities for a legal education for members of the black community.  The law school's Mission Statement provides that the law school's purpose is "to expand opportunities for the underserved in the legal profession . . . with special emphasis on a historically black heritage and tradition." And yet, TSU and TMSL administration regularly fail to follow clearly established law, industry-wide standards, and their own written policies and have created a culture of intense racism, gender bias, and hate at TSU.

16.    Dozens or hundreds of EEOC complaints and lawsuits have been filed against TSU in the past several years for all sorts of civil rights violations committed by TSU and its employees, including Equal Pay Act violations, sexual harassment, gender and race-based unequal pay, and gender and race-based harassment and other forms of discrimination.

17.     The students at TMSL do not receive consistent quality instruction, materials, or exams as a result; the bar passage rate is often below that required for American Bar Association (ABA) accreditation;[4] unqualified professors are allowed to harass, assault, and force out qualified professors in part to hide their own incompetency; and the law school mission is being destroyed from within.

**B.     TMSL's History of Willful Civil Rights Violations Including Equal Pay Act Violations**

18.     Professor Sacks is a Caucasian woman. TMSL has a long history of underpaying white females significantly while burdening them with much heavier workloads than blacks or males and ***hiding*** it very well.  White women earn less than male or blacks, and the largest pay differential is between white women and black males.[5]  TMSL has been falsifying official wage reports for the State of Texas for many years, and no one has been able to prove this until the Plaintiff obtained the men's W2s by court order after TSU refused to release them in *Sacks*

---

[4] The ABA requires a bar passage rate of at least 75% to maintain accreditation.  TMSL consistently has the lowest bar passage rate in Texas, a rate of 40% for first time bar examinees from the February 2017 bar exam, 64% for the July, 2017 bar exam, 28% for the February, 2018 bar exam, and 44.5% for the July, 2018 bar exam.  The pass rates of TMSL repeat bar takers were even lower, as low as 22.8% for the February, 2018 bar exam, and 23.5% for the February, 2017 bar exam.  Previously, Pat Garrison, a Caucasian female, was hired to help with TMSL's bar passage rate and the rate quickly went up to over 75%, whereupon Garrison was subjected to intense harassment and forced out of her job, and sued TSU for race discrimination. *See* Plaintiff's Second Amended Complaint, *Patricia Garrison v. Texas Southern University*, Civil Action 4:11-cv-02368 (S.D. Tex. August 29, 2012) (Document 44).  The bar passage rate for TMSL graduates plummeted thereafter.

[5] Statistical analysis and source documents are on file with the Court in *Sacks v. TSU I.*

*v. TSU I.*[6]  The W2s proved that TSU created grossly false reports of men's wages and understated the wages paid to men by up to about $70,000.00 per year to hide the willful and ongoing EPA violations while overreporting the Plaintiff's wages and failing to pay Plaintiff's wages promised by TSU in TSU's salary letter on TSU's letterhead.

19.    Plaintiff  and  other  white  women  were  targeted  for  intensive workplace harassment and expulsion upon Defendant Douglas's return to the law school in 2015.  Douglas became the law school dean (again) in 2016. While Douglas was the TMSL dean, the following civil rights violations occurred at TMSL:  1)  administrators'  intentional  and  wrongful  withholding  of  wages (including  BRP  and  longevity  pay)  due  and  owing  to  women  and  whites (numerous white employees have testified or will testify about TSU's habit of withholding wages from white employees) and ignoring state law and TSU/TMSL policy manuals to manipulate the distribution of taxpayer dollars to deny earned advancements, titles, pay increases, and other monies to Caucasians and females in violation of the Constitution, federal, and state laws while grossly overpaying male law  professors  who  have  lesser  academic  credentials,  less  published  quality scholarship, and teach fewer course/course hours;  2) TMSL deans and professors

---

[6] Plaintiff's Equal Pay Act claim has been pending since 2018 and the trial has been reset repeatedly and is the oldest case in Judge Ewing Werlein's docket.  Plaintiff filed a request to set the trial date as a priority.

acted under color of state law and used state processes maliciously to violate the Plaintiff's (and others') clearly established and known civil right based on her race and gender;  3) TMSL discouraged and ignored reports of sexual assault of female law students and law professors perpetrated by male law students and male law professors and TMSL professors and administration persuaded students not to file sexual assault complaints with TSU and ignored or failed to reasonably respond to female law professors' serious sexual assault and/or harassment complaints against male law professors;  4) false accusations of discrimination directed at whites for harassment purposes and to threaten their reputation and  employment through the use of official law school committee processes;   5) beginning in 2019-2020, harassing the Plaintiff (and other women) by forcing them to spend large quantities of time dealing with frivolous and ineffective new law school procedures and policies, creating time-consuming menial job duties and even more onerous workloads for the women, causing exhaustion for the women;   6) slandering targeted group members to students, faculty, and third parties;   7) malicious, calculated attempts to force Caucasians and women to resign tenured positions, which included falsifying pay data and creating other fake "evidence" to harm complaining women in response to valid discrimination complaints;   and 8) retaliating against the many TSU employees who lodge civil rights complaints against TSU/TMSL to the point of forcing their resignations.

20.    TMSL routinely denies white and female professors employment opportunities and benefits that non-white and male professors routinely enjoy such as dean positions and director positions, large sums of additional income, large travel budgets, and reasonably qualified administrative and research assistants. TMSL then points to the dean and director titles as a "factor other than sex" to justify the enormous male v. female pay gap and to try to defeat Equal Pay Act lawsuits.

21.    TSU and TMSL fail to follow TSU's and TMSL's own written policy manuals concerning distribution of wages, gender and race discrimination complaints, and required annual assessments of workloads to assure fairness.  TSU routinely fails to follow the law and its own written policies requiring TSU to produce annual workload reports to assure fair workload distribution among professors and in fact forces white females to carry much more burdensome workloads for far less pay than male or black professors and otherwise ignores its own policies and the civil rights laws on a regular and consistent basis.

22.    Plaintiff's base salary and total compensation were consistently lower than that of law school professors who perform similar jobs but who are black and/or male despite the fact that Plaintiff has better credentials, is more productive,

handles a more onerous workload at the law school, provides more public service, and produced the highest quality law review articles in TMSL history.[7]

23.   TSU's unequal pay and unfair working conditions are grounded in gender bias and racism.   Plaintiff's gender and race motivated the unfair and unlawful treatment perpetrated by all defendants.   TSU fails to follow its own policy manuals and federal law, and routinely falsifies its annual wage reports to **_underreport_** men's true compensation and to hide the fact that females and whites are making significantly less than blacks and males for performing the same essential job duties.  There are dozens of examples of this; a few examples follow.

a.  **James Douglas**.  Professor Douglas is a black male with a J.D. from TSU and a J.S.M. from Stanford.  He joined the TMSL faculty 29 years before Plaintiff.   Professor Douglas has virtually no scholarship, and in the past 49 years published a total of *one* brief academic article with *one substantive footnote* in a bottom-tier law review.  Professor Douglas's base pay is reported in the 2019 TSU Annual Salary Report as $213,198 with additional BRP pay of $1034, and his 2019 his W2 shows total compensation (Box 5) of $210,103.57.

---

[7] Plaintiff's expert report on "quality scholarship" is on file with the court in *Sacks v. TSU I*.

b. **Manuel Leal**.  Professor Leal is a male who has a J.D. from South Texas College of Law and an LL.M. from N.Y.U.  He joined the TSU law faculty four years after Plaintiff. Professor Sacks has published far more than Professor Leal, who has no top 50 law review articles published. Professor Leal started with a base salary approximately $20,000.00 higher than Plaintiff. By 2016, Professor Leal's base salary was $23,000.00 higher than Plaintiff's base salary.  Over the past 15 years, Professor Leal has received hundreds of thousands of dollars more in compensation than Plaintiff.  TSU underreported Professor Leal's compensation by approximately $60,000 per year in 2015 and 2016, as his W2s show $218,000 as opposed to the reported $158,000 for those years.  In August 2019, the TSU Annual Salary Report stated Professor Leal was paid $161,603, but his 2019 W2 reflects total compensation (Box 5) of $179,378.94.

c. **Okezie Chukwumerije.**  Professor Chukwumerije is a black male who has law degrees from Nigeria and Canada, and joined the faculty a few years after Plaintiff.  Professor Chukwumerije's base salary is within approximately $1000.00

of Plaintiff's base salary.  Professor Chukwumerije has a few publications, none of which are top 50 law review articles, and yet, he receives an additional $20,000.00 per year as a titled professor, while Plaintiff was denied a scholarship-based title. Soon after Professor Chukwumerije told a female student not to report an incident of sexual assault inside of a law school office, he was promoted to Associate Dean, with a presumed increase in pay of approximately $40,000 per year.  For the academic year ending in August 2019, the TSU Annual Salary Report stated that Professor Chukwumerije was paid $136,697, and despite TSU being ordered by the court to produce his W2, TSU failed to do so.  On information, he was paid at least $20,000 more than reported by TSU, as the Eugene Harrington Professor of Law since 2017. (Titled professorships normally confer an additional $20,000 per year.)

d. **Gabriel Aitsebaomo.**  Professor Aitsebaomo is a black male who has a J.D. from TSU and an LL.M. from University of Florida.  He joined the faculty a few years after Plaintiff, and yet in 2016 TSU reported that his base salary is within about $1000.00 of Plaintiff's base salary.  Professor Aitsebaomo also

was offered a dean position early on, and has been making approximately $40,000.00 – 45,000.00 more than Plaintiff for years, i.e., hundreds of thousands of dollars more than Plaintiff over the past decade, with lesser credentials and a scant publication record in low-ranking journals, while Plaintiff has consistently published in top 20 to top 50 law reviews and has been denied a dean position and a director position. For the academic year ending in August 2019, the TSU Annual Salary Report stated that Professor Aitsebaomo was paid $181,322, and despite TSU being ordered by the court to produce his W2, TSU failed to do so.

e. **Larry Weeden**. Professor Weeden is a black male who has a J.D. from Mississippi and no LL.M. He joined the faculty 10 years before Plaintiff. Professor Weeden has no top 20 law review articles, and most of his publications are in bottom-tier law journals. Yet, Plaintiff's base salary is approximately $32,000.00 lower than Professor Weeden's base salary. Professor Weeden has a title, for an additional $20,000.00 per year. Professor Weeden was offered a dean position in or about 2018, and his compensation in 2019-2020 was approximately

106,000.00 higher than Plaintiff's compensation. For the academic year ending in August 2019, the TSU Annual Salary Report stated that Professor Weeden was paid $170,777 plus BRP pay of $1034, plus an uncertain amount that TSU's 30(b)(6) compensation expert could not identify due to the "pooled" nature of the compensation. Weeden's 2019 W2 reflected total compensation (Box 5) of $239,698.06.

24.     TSU failed to pay Plaintiff in accordance with Plaintiff's official salary set by TSU for years, even though Plaintiff's salary was far below what male professors were paid for similar (or less) work. TSU also falsely **_overreported_** the Plaintiff's wages. For example:

    a.  In 2015, TSU reported that Plaintiff's salary was $135,246 and Roberson King funds were $20,000, for a total of $155,246, but paid her only $133,575 (W2 Box 5).

    b.  In 2016, TSU reported that Plaintiff's salary was $135,246 and Roberson King funds were $20,000 for a total of $155,246, but paid her only $147,961 (W2 Box 5).

    c.   In 2017, TSU reported that Plaintiff's salary was $135,246 but paid her only $117,735 (W2 Box 5).[8]

    d.   In 2018, TSU reported that Plaintiff's salary was $137,951 plus a summer stipend of $9000 for a total of $146,951 but paid her $140,381 (W2 Box 5).

    e.   In 2019, TSU reported that Plaintiff's salary was $137,951 but paid her only $133,326.

    f.   TSU breached its agreement to pay Plaintiff in accordance with the salary TSU promised in official salary letters consistently, year after year, upon Douglas's return to TMSL.

25.    The gender and race-based pay disparity and other forms of discrimination and retaliation violate Title VII, the Equal Protection Clause, the Equal Pay Act, and/or other clearly established constitutional and federal law. The retaliation caused the constructive termination about which Plaintiff now complains.

---

[8] Some amount this year may have carried over to 2018 due to a change in payment terms, but this does not account for the large amount of unpaid wages.

**C.**   **Douglas's Long History of Racism and 2015 Return to TMSL**

26.     Douglas has a long history of anti-white sentiment and conduct.  His TSU personnel file contains a transcript of a racist speech he gave many years ago (TSU failed to produce this transcript in violation of discovery rules but another TSU plaintiff obtained it in in a prior case).  He was sued for racial discrimination against whites and lost, then never paid the punitive or compensatory damages assessed against him personally.  That is, despite the jury verdict, Douglas paid nothing and testified that the Texas Attorney General paid for his personal liability, meaning that the Texas taxpayers paid for his intentional and malicious civil rights violations in violation of Texas's policy that taxpayers are not responsible for punitive damages assessed against individuals for malicious or willful misconduct.[9]

27.     Soon after the jury verdict against Douglas in the race discrimination case brought by white law professors, he was promoted to become the TSU President with an enormous increase in pay and power.  This reflects "TSU's truth" as he stated in deposition in 2020.  Douglas has made clear to many people over the years that whites do not belong at TSU, and his behavior is consistent with this attitude.

---

[9] Douglas was sued before for intentional race discrimination and the jury assessed $81,000.00 in punitive damages and $55,967.00 in compensatory damages against Douglas personally.  *See Harrington v. Harris et al.*, 118 F.3d 359, 364 (5th Cir. 1997).  In *Sacks v. TSU* I, Douglas testified that the Texas Attorney General paid the damages assessed against him personally.

28.    Douglas did not work at TMSL for several years then returned to the law school in or about 2015.   After Douglas returned to teach and to help administer the law school, Plaintiff and other whites suffered numerous adverse employment decisions resulting in significant lost compensation, including revocation of their lucrative scholarship-based titles, wage withholding, and other lost income and employment benefits.

29.    After Douglas returned to the law school and became the interim dean in 2016, he created an intense culture of racial hate and gender discrimination that grew over time and became intolerable in 2019-2020.  Students and faculty became more racially divided and students felt free to make blatant anti-white statements on Facebook reflective of TSU's overall anti-white culture.[10]

30.    Douglas was the interim law school dean when the ABA made findings against TMSL because the law school "persisted" in ignoring scores of sexual harassment, sexual assault, and Equal Pay Act complaints in violation of ABA policy.  Douglas reacted by establishing a Gender Equity Committee (GE Committee) to review and correct the sex-based discrimination, but he and TSU then thwarted the committee's attempts to obtain pay data and after nearly *three*

---

[10] Tamoria Jones is a TMSL graduate and was Harold Dutton's Chief of Staff at the time of her racist Facebook post.  Harold Dutton has been Douglas's friend for decades and is also a TMSL graduate.  Jones wrote on Facebook, "You know I gotta go out with a BANG!!!  I'm not letting these whites make it . . . [shouting icon] they gonna respect the Negroes of the TMSL."  This attitude is typical among Douglas's nonwhite group of haters and represents the culture at TMSL.  Jones was rewarded by TMSL by being featured in the TMSL monthly periodical.

**years** of the GE Committee's repeated requests for the pay data, TSU produced grossly false pay data that underreported the men's compensation to hide intentional gender-based wage discrimination.

### D.   2017-2018: American Bar Association Investigation and Douglas's Creation of the Gender Equity Committee

31.    The egregious racist and sexist hostile work environment has been the subject of dozens or hundreds of EEOC charges of discrimination lodged against TSU and TMSL, and dozens or hundreds of discrimination and civil rights lawsuits over the years filed against TSU and TMSL.

32.    Female law professors have testified or otherwise referred to the hostile work environment at the law school as "constant," "persistent," "pervasive," and/or "intolerable."  In the past 10 years alone, female and/or white law professors have described the hostile work environment at TMSL as "pervasive," with "hostile office rants" occurring on a "regular, almost daily basis" and that the "retaliation is beyond isolated."[11]  TSU's and some of its employees' misconduct necessitated these women's resignations, despite having tenure and losing lifelong financial security by resigning.

33.    Similarly, female dean Patricia Garrison described how the law school dean "embark[ed] on a campaign to make her life extremely difficult,"

---

[11] *See Jackson v. Texas Southern University*, 4:16-cv-01123 (S.D. Tex. 2011) (Document 17).

"micromanaged every detail" of her job (despite the fact that she was a dean), refused to allow her the authority to do her job, withheld money earned and owed, refused to allow her to have a key to rooms to which she needed access in the law school, and harassed Dean Garrison in a "varied and constant" manner.[12]  Both of these other TMSL professors describe intense retaliation when they finally filed lawsuits, and Professor Sacks experienced similar harassing, discriminatory, and retaliatory treatment in response to her valid discrimination complaints.  In 2019-2020, the Plaintiff obtained evidence in *Sacks v. TSU I* and learned that TSU has been paying women far less than men for many years and was hiding it through false wage reporting.  Plaintiff also learned at this time many other facts that made it clear that TSU and TMSL was refusing to follow civil rights laws with audacity and had no intention of ever following the law.  The only reasonable option was to resign.

34.     TMSL is accredited by the American Bar Association (ABA) and the ABA periodically reviews the law school's performance as part of the accreditation process.  The ABA learned of TMSL's depth of sexual harassment and unequal pay and gave TMSL many months to work toward compliance with the ABA's gender discrimination policy.  For years, TSU ignored the ABA's demands to

---

[12] *See Garrison v. Texas Southern University*, 2011 WL 4457374 (S.D. Tex. Sept. 21, 2011). *See* Plaintiff's Second Amended Complaint, *Patricia Garrison v. Texas Southern University*, Civil Action 4:11-cv-02368 (S.D. Tex. August 29, 2012) (Document 44).

investigate and solve the women's many discrimination complaints against the law school.

35.     In June 2017, while Defendant James Douglas was the interim dean of the law school, the ABA issued to the law school a written Notice of Censure and Directed Specific Remedial Action (ABA Notice of Censure).[13]   In the ABA Notice of Censure, the law school was ordered to pay a fine of $15,000.00 for its substantial and persistent non-compliance with ABA standards prohibiting gender discrimination and sexual harassment.  The ABA also required the law school to post a notice on the law school's website concerning the school's ongoing problem with gender discrimination complaints and lawsuits.

36.     The ABA directed the law school to remedy the unequal pay based on gender.  Thereafter, to appease the ABA, in early 2017 law school interim dean, James Douglas created a "Gender Equity Committee" ("GE Committee") to address the ABA's concerns.  The committee allegedly was created to address the gender discrimination issues.  However, TSU, TMSL, and Douglas treated the committee members with hostility, failed and refused to turn over public records concerning the law professors' compensation, and did everything to prevent the

---

[13]  *See* ABA Journal, "Texas Southern's law school receives ABA public censure after sex discrimination allegations," July 20, 2017, *available at:*
http://www.abajournal.com/news/article/texas_southerns_law_school_receives_aba_public_cens
ure_involving_equal_oppo).

committee from doing its primary job of assessing the gender pay gap and proposing remedies.

37.     TSU and TMSL refused to give the pay data to the GE Committee for **nearly three years**, then produced false pay data that grossly underreported the men's compensation.  When the GE Committee Chair (Rebecca Stewart) finally obtained the falsified pay in December 2019, she was informed by former dean McKen Carrington that the pay records did not disclose "off the books" payments to men.  No one showed up at the meeting to discuss the pay data and no one knew it was bogus data until much later.

38.     No one ever obtained the men's true total compensation until the Plaintiff did in *Sacks v. TSU I*, which enabled her to prove that TSU was falsifying pay data and grossly understating the total compensation to male law professors for years as part of its annual official employee compensation report.  TSU's conduct was willful and intentionally hid the true male v. female pay differential

39.     Both the original chair of the GE Committee and the second chair of the GE Committee – both white women – resigned from the law school following their assignment as the chair of the GE Committee between 2019-2020.  Plaintiff attended GE Committee meetings and voiced concerns about the lack of transparency and apparent gross disparities in opportunities and total compensation

between male and female law professors, and she was treated with hostility by the Individual Defendants and other faculty members.

40.    Despite facing possible revocation of ABA accreditation, Defendant Douglas, while acting as interim dean of the law school, announced in a faculty meeting that a report found that there was "no problem" with gender pay discrimination at TMSL.  Professor Tekle pressed Douglas for information about *who* authored the "report," and Douglas waffled and was cagey but finally admitted that he and Mr. Huey, TSU's general counsel, had reviewed the pay data and determined it was fair.  Neither Douglas nor Huey conducted a competent or reasonable Equal Pay Act analysis and tried to sweep the serious law school problems under the rug again.

41.    The law school has taken no reasonable steps to equalize the salaries of the professors, despite the ABA's specific directive to take immediate steps to equalize salaries and numerous EPA complaints for years.

42.    According to a TSU internal audit of March 2020, eight state and federal agencies are investigating TMSL for civil and criminal misconduct, which included the FBI, the Texas Rangers, the Department of Education, and the ABA.

**E.    2016-2017: Plaintiff's Complaints to TSU Human Resources and the EEOC and Retaliatory Harassment and Increased Wage Withholding**

43.    Professor Sacks attempted to get relief from the harassment and unequal pay informally by filing a grievance with TSU and TMSL administration years before she filed a lawsuit.  On or about September 15, 2016, Plaintiff personally delivered to Douglas (the law school dean at that time), TSU Human Resources, and TSU President Austin Lane's office, *inter alia*, a ten-page detailed complaint of unequal pay, discrimination, and harassment based on race and gender, including 163 pages of exhibits.  Plaintiff hoped to resolve the issues informally and waited patiently for a response for many months.

44.    Defendant Douglas, in his official capacity of acting law school dean, did nothing in response to the Plaintiff's detailed complaint.  He knew almost nothing about the 173-page document in his deposition in 2020 and then later signed an affidavit that he had read the entire complaint (which he obviously had not).  Douglas took no corrective action whatsoever in response to the Plaintiff's detailed and factual account of pervasive, continuing racial and gender harassment.

45.    Instead, TSU and the Individual Defendants retaliated against the Plaintiff by misusing official TMSL committee processes and/or using their administrative or official positions of power over the Plaintiff to deprive the

Plaintiff of earned wages or benefits of employment to which she was entitled. Among other acts of retaliation:

    a.  Some of the Individual Defendants used their positions as committee members to recommend a bogus finding of discrimination against the Plaintiff in retaliation for her first discrimination complaint sent to Dean Holley in 2016 just weeks prior, despite the fact that there was "no evidence" of discrimination in part because all of Plaintiff's exams are blind graded, as the dean ultimately concluded in rejecting the committee's bogus recommendation;

    b.  TSU withheld tens of thousands of dollars of monies it admits it owed Plaintiff as wages, including over $20,000.00 in 2017 after Plaintiff filed her first EEOC Charge in February 2017; and

    c.  Some of the Individual Defendants used their dean positions to deny research monies and other benefits of employment to Plaintiff that Plaintiff had earned.

46.    After more than two years of waiting for TSU do take some reasonable measures to stop the worsening race and sex-based harassment,

Professor Sacks had no option but to pursue a remedy in a court of law and filed a lawsuit in 2018, *Sacks v. TSU I.*

47.     The Individual Defendants also harassed the Plaintiff maliciously and created an intolerable hostile work environment after her original complaint.  The harassment and retaliation became so pronounced that Plaintiff and other female professors characterized the working environment in 2019-2020 as "intolerable." These female professors felt compelled to resign and did so out of necessity, giving up lucrative tenured academic positions.

48.     The harassment and retaliatory conduct escalated after Professor Sacks notified TSU administration of the pervasive harassment, and especially in 2019-2020, just as it did when other professors complained about similar harassment and abuse in their lawsuits.   The retaliatory conduct that forced Plaintiff to resign violates Title VII, 29 USC Section 215(a)(3), other anti-retaliation laws, and the Constitution. ***Any person*** who aids in retaliating against a person for making even an informal and internal Equal Pay Act complaint is liable pursuant to 29 USC Section 215(a)(3).   Plaintiff made internal and then formal complaints.

**F.**   **2019-2020: First Female Law School Dean Forces Out Competent Female Law Professors**

49.     In 2019, TMSL hired Joan Bullock to be the first female TMSL dean. Bullock had a preexisting relationship with James Douglas and he pushed her law school dean candidacy on the faculty.  James Douglas advised Bullock and her actions as the law school dean furthered his racist agenda to oust the most qualified white female law professors.

50.     Bullock increased the workload substantially as to the white female professors in particular by adding time-consuming, unnecessary, and menial tasks such as rearranging the order of subjects taught in classes (requiring many hours of extra work to revise syllabi that had been in use for many years), called many extra faculty meetings which were inefficient and a waste of time, and created extra time-consuming tasks disproportionately performed by white female professors. Bullock told Plaintiff that she intended to make life less comfortable for the law professors.  She externalized a disproportionate burden of the law school's failures and incompetency onto the white female professors.  All three white female law professors resigned within one year of Bullock becoming the dean.

51.     Bullock assigned time-consuming, onerous additional menial tasks that had never been assigned in the prior 20 years.  None of the new menial tasks did anything to address the problems of incompetency and inadequate bar passage rate at TMSL.  New tasks included new methods of attendance recording and

micromanaging the order with which the torts topics were taught.  The burden of some law professors' incompetency even to write law school exams was pushed onto the female professors disproportionately and the female professors had to perform burdensome and time-consuming work that the males did not have to perform.

52.    For example, TMSL paid Kaplan tens of thousands of dollars to write the law professors' exams for them because numerous TMSL professors could not do the job professionally or adequately.  This forced taxpayers to pay for work product that law professors are already paid to perform. Bullock would not allow the competent professors such as Plaintiff to examine their students in violation of their academic freedom while requiring them to edit and correct Kaplan's atrocious proposed torts questions.

53.    Each torts professor was assigned to correct and edit 25 proposed Kaplan torts questions.  Torts professors Rebecca Stewart, Connie Fain, and the Plaintiff spent many hours correcting the invalid and grammatically incorrect Kaplan draft questions. Defendant Weeden (the fourth torts professor) did nothing and did not even bother to attend the meetings to discuss the Kaplan torts exam. Instead, he sent a very brief email stating that all Kaplan questions he was assigned to review were acceptable.

54.     Weeden obviously had not even reviewed his assigned questions because Stewart and the Plaintiff shared Weeden's burden of reviewing the draft Kaplan questions and found many substantive and grammatical errors in Weeden's assigned questions that would have made the torts questions very unfair to the law students had the questions not been edited and corrected.  Meanwhile, Weeden was making more than $100,000.00 per year more than Stewart or the Plaintiff.

55.     Bullock wrote an offensive email to Rebecca Stewart that was a reason Stewart resigned despite having tenure and no other opportunity to continue a professorship in the legal academy.  Stewart complained about how the male professors were "underutilized" while certain females were horribly overworked. Bullock's response was to change Stewart's teaching schedule to make it much more onerous, which pushed Stewart to resign.  Stewart was a much-loved and very talented law professor.  The Plaintiff was upset when Stewart shared Bullock's email to Stewart and realized that the new female dean would not correct the longstanding gender-based workload and salary violations at TMSL.

56.     TSU and the Individual Defendants made it impossible for the Plaintiff to continue working at TMSL.  The working conditions became intolerable for numerous female law professors and the Plaintiff and several others resigned between 2019-2020 (including all of the white females, two of whom did not find another tenured academic appointment).

57.     Plaintiff reasonably felt compelled to resign because it was clear that the racism and harassment would not be addressed and were getting worse at TMSL.  Plaintiff realized in 2019-2020 that the abuse and blatant EPA violations were well-known to TSU and TMSL and that TSU and TMSL did not intend to correct the violations but instead created a great deal of false and fraudulent evidence to try to defend the valid complaint.   Under these circumstances, employees are allowed to resign and seek damages for constructive termination.

### G.     Individual Defendant Liability Under 42 USC Sec. 1983 & 29 USC Sec. 215(a)(3)

58.     The Individual Defendants used their official positions as law school administrators, professors, or committee members with authority over Plaintiff's wages, disciplinary proceedings, and employment intentionally to deprive Plaintiff of her rights against discrimination and in retaliation for Plaintiff's complaints of unequal pay and discrimination.  The Individual Defendants are personally liable pursuant to 42 USC Sec. 1983.  The Individual Defendants' retaliation against the Plaintiff for complaining about discrimination also violated the anti-retaliation provision of the FLSA, 29 USC Sec. 215(a)(3).  The Individual Defendants are liable for compensatory and punitive damages under both federal statutes.

59.     The Individual Defendants are sued in their personal capacities for self-interested, malicious, intentional, discriminatory, criminal and/or tortious

misuse of state power while acting under color of state law, and are jointly and severally liable therefor, based on a concert of action and indivisible injury arising from their intentional violations of clearly established federal statutory and constitutional law.

60.    The Individual Defendants' misuse of state power to deprive the Plaintiff of her civil rights and her employment was undertaken with intent and malice, which will be proven by admissible evidence (some of which is already on file with the court in *Sacks v. TSU I*) that the individual defendants not only misused state power, but also engaged in tortious or criminal behavior in the law school hallways, parking lot, and other places, as part of the scheme to force Plaintiff to resign.

61.    Some of Defendant Douglas's history of racism and misconduct is discussed herein above, Section IV C-E.  Douglas returned to the law school in 2015 and began harassing whites and depriving them of earned titles, employment benefits, and wages. For example, both Walt Champion (white) and the Plaintiff had their high-production, scholarship-based titles revoked in early 2016 despite producing the most high-quality law review articles or the most academic books in the entire law school.

62.    After Douglas returned to TMSL in 2015, the Plaintiff was subjected to intense harassment in the law school and while walking to and from her

car/parking to the point that the Plaintiff had to hire personal security guards to accompany her while at TSU.  Among other things, a TSU security guard told Plaintiff after she complained about discrimination that some of the law professors "want to kill" her.  Plaintiff spent thousands on security guards to be with Plaintiff so that she could keep her job as she sought a remedy with TSU or the Court.  But things got worse until the Plaintiff and other females resigned in 2019-2020.

63.     Douglas acted with malice toward the Plaintiff because the Plaintiff is female and white.  Douglas knew that his conduct violated clearly established constitutional and federal law.  He felt entitled to commit the violations, protected by TSU administration which encourages and ratifies such misconduct.  Douglas is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*.  TSU is Douglas's employer and TSU is liable for Douglas's misconduct.

64.     Defendant Walker is defendant Douglas's ex-girlfriend and is also known for treating whites with disdain and abuse at TMSL.  Walker has harassed and aggressed against Plaintiff for several years, necessitating repeated complaints to TSU Human Resources and the TMSL dean, among others.  Walker has engaged in very aggressive conduct toward Plaintiff in 2019-2020 and has made comments about Plaintiff's race during one of Walker's loud and unprofessional outbursts.

65.     Walker misused her official law school committee voting power to try to make a finding that the Plaintiff discriminated against a student soon after Plaintiff's first complaint of unequal pay and discrimination.  The law school dean ultimately found "no evidence" to support the committee's bogus recommendation, but if the dean had accepted Walker's and the other committee members' absurd finding, the Plaintiff could have been terminated for discrimination.  Walker engaged state action maliciously to harass, discriminate against, and retaliate against the Plaintiff based on gender and race, in violation of numerous constitutional provisions and federal anti-discrimination laws which are clearly established, rendering her personally liable under 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3).  Walker also used law students to aid in abusing state authority and brought the students into meetings to vote against the Plaintiff in violation of the law.

66.     Walker has a reputation for unprofessional rants in the law school and is known as a "loose canon," yelled at Plaintiff in the hallway in front of Plaintiff's students and followed her to her office where Plaintiff was attempting to take her students after her children's constitutional rights class.  Walker has physically assaulted Plaintiff repeatedly, and made contact with Plaintiff on one or more occasions, which constitutes civil battery.

67.     Walker's harassment of the Plaintiff escalated in 2019-2020.  In thus time frame, in front of Plaintiff's step son, Walker threw her hair into the Plaintiff's face in the law school lobby and approached the Plaintiff's car aggressively in a church parking lot, yelling, "You can't park here!"

68.     Walker acted with malice toward the Plaintiff because the Plaintiff is female and white.  Walker knew that her conduct violated clearly established constitutional and federal law.  She felt entitled to commit the violations, protected by TSU administration which encourages and ratifies such misconduct.  Plaintiff complained to TSU Human Resources about Walker's discriminatory harassment and TSU failed to conduct a reasonable investigation or to correct the problem in direct contravention of TSU's official policy manuals for handling discrimination complaints and also in violation of Title VII and other laws.  Walker is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*.  TSU is Walker's employer and TSU is liable for Walker's misconduct.

69.     Defendant Colon began harassing Plaintiff several years ago by: slandering Plaintiff to students and falsely stating that Plaintiff was fired from a prior position when in fact Plaintiff was offered to remain in the prior position but chose to return to TMSL; calling Plaintiff "crazy" and "discriminatory" to students and telling students not to enroll in Plaintiff's classes; harassing Plaintiff's research

assistants and reprimanding them for working with the Plaintiff while putting pressure on them to work for him instead; yelling at Plaintiff in a faculty meeting and participating in a voting block to deny Plaintiff the benefits of employment based on her race and/or gender.

70.    Colon aided and abetted Otero's Academic Standards Committee's attempt to make a finding of discrimination against the Plaintiff with "no evidence," which could have led to Plaintiff's termination had the false discrimination complaint been accepted by the law school dean.  He persuaded the failed-out law student to make a complaint about the Plaintiff knowing that the committee was stacked against the Plaintiff with professors such as Walker, Otero, and Anga, all of whom had assaulted or physically battered the Plaintiff in the past. He also used his faculty voting power to revoke the Plaintiff's title because the Plaintiff is white.   He aided in the misuse of state action for malicious, discriminatory, and retaliatory purposes in violation of clearly established constitutional and federal anti-discrimination laws, subjecting him to personal liability under 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3).

71.    Colon's shockingly poor judgment and lack of professionalism is open and obvious at the law school. Colon also comments on females' bodies in the law school and shows around a photograph of an attractive female pole dancer from South America.  He is known for referring to whites as "fucking whites" or

"fucking white people," and is also known for giving preferential treatment – including additional study materials – to Hispanic students that he denies to black and white students.  Colon is a known anti-white racist, like Douglas, Anga, and Walker.

72.     Colon acted with malice toward the Plaintiff because the Plaintiff is female and white.  Colon knew that his conduct violated clearly established constitutional and federal law.  He felt entitled to commit the violations, protected by TSU administration which encourages and ratifies such misconduct.  Plaintiff complained to TMSL administration about Colon's discriminatory harassment repeatedly but TMSL did not take action reasonably to stop the harassment in direct contravention of TSU's official policy manuals for handling discrimination complaints and also in violation of Title VII and other laws.  Colon is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*.  TSU is Colon's employer and TSU is liable for Colon's misconduct.

73.     Defendant Otero has harassed and aggressed against Plaintiff for several years, necessitating repeated complaints to TSU Human Resources and the TMSL dean, among others. TSU did not take reasonable corrective action in response to the Plaintiff's complaints in direct contravention of TSU's official

policy manuals for handling discrimination complaints and also in violation of Title VII and other laws.

74.     Otero was part of a group of nonwhites that misused their official voting power to deprive the Plaintiff of wages and other benefits of employment because Plaintiff is white.   In 2016, just weeks after Plaintiff first complained about discrimination, Otero was the chair of the Academic Standards Committee and she orchestrated the kangaroo committee proceeding to attempt to create a false finding of discrimination against the Plaintiff by using a failed-out law student's desperation and TSU's official, absurd policy for failed-out law students. A finding of discrimination could have resulted in Plaintiff's job termination and Otero's behavior as committee chair with state power over the plaintiff was an abuse of her delegated state power.   Otero maliciously deprived the Plaintiff of rights clearly established under the Constitution and federal anti-discrimination laws.

75.     Like Walker, Otero used TMSL law students to harass the Plaintiff. Otero solicited her teaching assistant, Andrea Curtiss aka Andrea Kurzac, to join the committee and vote in favor of a finding of discrimination against the Plaintiff as part of Otero's attempt to create a false record of discrimination against Plaintiff.  In the committee meeting, Kurzac (who Plaintiff had never seen or heard of before) raised her voice at the Plaintiff and then sent very unprofessional and

derogatory emails to the law school dean about Plaintiff in an attempt to influence the dean to make a finding of discrimination against Plaintiff despite the dean's ultimate conclusion that there was "no evidence" to support the false claim of discrimination.  Plaintiff learned of these emails in 2020 via evidence produced in *Sacks v. TSU I.*

76.     Kurzac behaved inappropriately in the law school in other ways as well. Kurzac got into a heated, loud argument with another law professor over Kurzac's inappropriate conduct in the law school.  Kurzak acted in concert with Otero to manipulate official state processes to create a false finding of discrimination against Plaintiff and did Otero's bidding with malicious intent demonstrated by her unprovoked hostility. Ironically, Kurzac is now a prosecutor at the Harris County Prosecutor's office according to her Facebook profile.

77.     Otero's intent is shown by her history and pattern of harassing the Plaintiff.  Otero physically assaulted and civilly battered the Plaintiff by slamming a door into the Plaintiff's foot and grabbing her arm in the hallway near the dean's suite prior to conducting the kangaroo committee meeting to try to pin the Plaintiff with discrimination despite no evidence.  Otero knew this conduct was unlawful and appeared out of control with senseless and unprovoked bias-based rage.  Otero has a reputation for treating attractive female law students with hostility.

78.    Otero acted with malice toward the Plaintiff because the Plaintiff is female and white.   Otero knew that her conduct violated clearly established constitutional and federal law.  She felt entitled to commit the violations, protected by TSU administration, which encourages and ratifies such civil rights violations committed against whites and females.  Plaintiff complained to TSU about Otero's discriminatory harassment and TSU failed to take reasonable corrective action in direct contravention of TSU's official policy manuals for handling discrimination complaints.  Otero continued to harass the Plaintiff until she resigned and Otero is personally liable for her civil rights violations which include retaliation in violation of the Fair Labor Standards Act.  Otero is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*.  TSU is Otero's employer and TSU is liable for Otero's misconduct.

79.    Defendant Anga is also known for treating whites and certain females with disdain and abuse at TMSL.  Anga has harassed and physically aggressed against the Plaintiff soon after she filed her first EEOC Charge in 2017 in retaliation for the Plaintiff's EEOC Charge filed just weeks prior. Plaintiff lodged a complaint with TSU Human Resources and the TMSL dean, among others but TSU never even responded.  Anga also harassed another female law professor, and there are at least two official TSU Human Resources complaints against Anga in the 2017-2019 time frame.  Despite this record of abusive and harassing conduct,

TMSL (Dean Bullock and/or James Douglas) saw fit to make Anga a dean at the law school in 2021.

80.     On April 17, 2017, Professor Anga (a TMSL graduate) sat in her car near Plaintiff's reserved parking space, then pulled into Plaintiff's reserved parking space just as Plaintiff approached her parking space.  Anga got out of her car, rudely told Plaintiff that Plaintiff is undeserving of a parking space, and physically charged at Plaintiff when Plaintiff asked her to move her car.  Anga got within ten inches of Plaintiff's face and repeatedly shouted in an angry and physically agitated manner, "What are you going to do about it!?"  Defendant Anga's hostility was unprovoked and a function of her racial hate that she demonstrated repeatedly on TSU campus.

81.     Anga intentionally caused the Plaintiff to be late to class; everyone knew there were big parking problems at the law school.  Anga's conduct was in the view of security cameras, but TSU/TMSL has failed to supply the footage after repeated requests, covering up Anga's misconduct.[14]  In addition, Plaintiff went to TSU Human Resources the same day of the incident to complain, and then submitted a written complaint.   TSU Human Resources never contacted the

---

[14] TSU admittedly destroyed intentionally evidence relevant to this case in 2017.  James Douglas testified in 2020 in *Sacks v. TSU I* that former TSU president Austin Lane told Dean Derrick Wilson to destroy an audiotape concerning the Plaintiff after Plaintiff filed her original EEOC charge.

Plaintiff about the complaint against Anga, did not conduct a reasonable investigation or take corrective action.

82.  Anga, in conjunction with Defendant Colon, shouted down the Plaintiff loudly in a faculty meeting as the chair recognized that the Plaintiff was the proper speaker and the others were out of order.  Colon and Anga continued to shout and yell with emotion in the meeting, falsely accusing the Plaintiff of calling Colon incompetent when Plaintiff said nothing like that (as the chair told Colon on the audiotape), until the Plaintiff left the meeting.  The meeting was recorded and the recording was produced to TSU in *Sacks v. TSU I*.  Plaintiff will introduce the recording at trial to show the loud aggression of Anga and Colon.

83.  Anga consistently demonstrated hate and hostility toward the Plaintiff (and other whites) in the law school and showed extreme anti-socialism with her gestures, refusing to acknowledge whites, or other inappropriate behavior.

84.  Anga acted with malice toward the Plaintiff because she is female and white.  Anga knew that her conduct violated clearly established constitutional and federal law.  She felt entitled to commit the violations, protected by TSU administration which encourages and ratifies such misconduct.  Plaintiff complained to TSU Human Resources about Anga's discriminatory harassment and TSU completely ignored her complaint, failed even to contact the Plaintiff, and failed to conduct even a cursory investigation or make findings in direct

contravention of TSU's official policy manuals for handling discrimination complaints and also in violation of Title VII and other laws. Anga was promoted to a law school dean position in 2021 despite the complaints of harassment against her on file with TSU Human Resources. Anga is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*. TSU is Anga's employer and TSU is liable for Anga's misconduct.

85. Weeden has demonstrated racist views and routinely brings up race when anyone questions the law school's misconduct or dismal bar exam performance. He routinely accuses anyone who challenges any of the incompetent or unlawful practices at TMSL of being "racist." Weeden accused the American Bar Association (ABA) of being "racist" in a faculty meeting after the ABA informed TMSL that it was not meeting ABA accreditation standards. This is despite the fact that the ABA has bent over backwards to accommodate TMSL's sub-par performance as a law school and has repeatedly given TMSL every opportunity to comply with ABA standards and to raise the bar passage rate.

86. Weeden targeted the Plaintiff for harassment and discrimination – including denying her wages as a law school dean with power over her wages – because she is white and female. He abused his state authority as an associate dean and chair of a faculty committee to harass and discredit Plaintiff, misrepresent her

scholarly productivity, and deny her research monies.  He has encouraged others to vote against Plaintiff, yelled and bullied other professors in faculty meetings to get his way in relation to denying Plaintiff employment benefits, and/or made untrue statements to other committee members to influence them to vote against Plaintiff and deprive her of a sabbatical and research monies.

87.    Weeden acted with malice toward the Plaintiff because she is female and white.   Weeden knew that his conduct violated clearly established constitutional and federal law prohibiting discrimination based on race or gender. He felt entitled to commit the violations, protected by TSU administration which encourages and ratifies such misconduct.  Plaintiff complained to the law school dean (Gary Bledsoe) about Weeden's harassment of Plaintiff and deprivation of her employment benefits and in response Bledsoe immediately promoted Weeden to be a law school dean with an attendant pay raise of about $40,000 (such that Weeden was now making about $106,000.00 more than Plaintiff despite performing less work, providing low-quality teaching, producing low-quality work, and refusing to do his share of law school work such as the Kaplan questions review, and harassing the Plaintiff.

88.    Weeden is personally liable for compensatory and punitive damages pursuant to 42 USC Sec. 1983 and 29 USC Sec. 215(a)(3), *inter alia*.  TSU is Weeden's employer and TSU is liable for Weeden's misconduct.

89.     The Individual Defendants acted in concert and collectively created an intolerable and abusive working environment as TSU was withholding large sums from Plaintiff's paychecks and subjecting Plaintiff to various forms of exhaustion harassment, threats to personal safety, and an increased and unfair workload.  By 2020, Plaintiff had no option but to resign due to the intolerable working conditions.

### H.     TSU's Policy of Ratifying and Rewarding Discrimination

90.     TSU and TMSL have a long history and pronounced agenda *to promote black male professors* to administrative positions with significant increases in pay *soon after they have received official complaints or jury verdicts for discriminating against others based on race or gender.*  Similarly, certain TMSL male professors were promoted soon after they helped to hide, aided, or abetted others' racial and gender discrimination.  A few examples follow.

91.     Soon after James Douglas was found liable for compensatory and punitive damages for blatantly discriminating against white law professors, he was elevated to the position of TSU President, with an enormous raise in salary and benefits.  Douglas brags about being immune from consequences for his civil rights violations.  When a female librarian complained about gender-based unequal pay in or about 2017, Douglas told her that he is not afraid of being sued because

the government attorneys and insurance will protect him from consequences. (*See* Declaration of Itunu Sofidiya, on file in *Sacks v. TSU I*).

92.    When McKen Carrington was the law school dean and numerous EEOC Charges were filed against him for his horrific misogynist behavior and statements toward female law professors (including telling a 50-year-old childless professor that she needed to "go have a baby" to become less aggressive and physically jumping back and forth in front of a female professor to prevent her from walking down the law school hallway after she made a gender discrimination complaint), a group of female professors set up a call faculty meeting to obtain a vote of no-confidence to oust Carrington from the dean's office.  At that meeting, Gabriel Aitsebaomo, a junior faculty member, interrupted and filibustered the no-confidence faculty meeting and made such a loud and aggressive spectacle of himself that the faculty meeting ended quickly.  Soon thereafter, he was promoted to a law school dean position with a significant pay raise around $45,000.000 per year and remained in the dean's position for many years, with a partial and very easy teaching schedule.

93.    In or about 2018, Plaintiff made an internal complaint to interim Dean Gary Bledsoe concerning Defendant Weeden's ongoing harassment and intentional deprivation of Plaintiff's wages and perks via misuse of his power as a chair or committee member with authority over Plaintiff's benefits.  Plaintiff relayed to

Dean Bledsoe that Weeden attempted to persuade other committee members to lie about the outcome of the committee vote so that Dean Bledsoe would not know that two students were brought in by Weeden to vote against the Plaintiff in violation of state law.

94.    Instead of investigating Weeden's misconduct and reprimanding Weeden for his dishonesty and attempts to harm the Plaintiff by depriving her of employment benefits, Bledsoe ***promoted*** Weeden to be a an associate dean in the law school.    After his promotion, Weeden's compensation became about $106,000.00 more than Plaintiff's despite Weeden's horrible teaching evaluations and dismal, low-quality scholarship (mired with grammatical errors, misspelled words, and legal arguments that are wrong as a matter of law).

95.    In or about 2018-2019 a female law student was sexually assaulted by the TMSL student body president in his law school office provided to him by TMSL administration.    Two professors, including Okezie Chukwumerijie, advised her not to make a complaint about the sexual assault because the student body president was "popular."    Finally, the female student told the Plaintiff about the incident and the other professors' responses to her verbal complaints to them.    In 2020, Chukwumerijie was promoted to a law school dean position with an attendant pay raise of approximately $45,000.00 per year.    He had been given a title for scholarship as well, with an attendant $20,000.00 per year, making around

$65,000.00 more than the Plaintiff and about $90,000.00 more than Rebecca Stewart despite the white females' heavier teaching load and overall law school workload, their superior academic background and extraordinary teaching and work ethic, and their superior record of scholarly and educational production.

96.    Defendant Anga has a documented history of harassment against whites and other females, resulting in multiple complaints to TSU Human Resources against Anga.  In late 2020 or early 2021, Dean Bullock promoted Anga to a law school dean position, despite her aggressive racist and misogynist treatment of other female law professors and record of misconduct.

97.    TSU and TMSL have shown a clear pattern of rewarding the most racist and misogynist people on TSU campus and handing to them the reins of authority at TSU.  TSU's policy of allowing and ratifying abusive civil right violations aimed at whites and females – and white females such as the Plaintiff in particular – renders TSU liable for TSU's employees' misconduct.  TSU is both vicariously liable and liable for TSU's institutional misconduct.  Injunctive relief against TSU's longstanding discrimination is proper.

## I.    Legal Bullying and Litigation Abuse by TSU

98.    Part of TSU's modus operandi is intensive legal bullying and "wallet-whipping" of all persons who challenge TSU's horrific civil rights violations by filing lawsuits.  TSU routinely refuses to follow very clear civil procedure and

discovery rules, creates false documentary evidence, commits perjury via its employees, and forces plaintiffs out of court due to the exorbitant expense and frustration TSU causes to plaintiffs in litigation.  TSU is a Texas state actor and notorious legal bully.

99.     Because TSU is a Texas state school, TSU and its employees are represented in litigation by the Texas Attorney General's Office. Numerous witnesses have attested to unethical and expensive legal bullying by the TSU via the Texas AG, including the Plaintiff, Pat Garrison, and Itunu Sofidiya, all of whom brought lawsuits against TSU/TMSL.  Among other things, TSU/TMSL:

1) Refuses to provide discoverable documents such as the male professors W2s in an Equal Pay Act case and will not provide contact information for witnesses, forces motions to compel as a regular course of litigation, unnecessarily increases the expense and difficulty of litigation, and routinely forces plaintiffs to dismiss lawsuits without a remedy due to financial concerns.

2) Increases the costs of litigation in numerous ways, such as: producing false pay data and perjurious affidavits so that the plaintiffs have to spend a great deal of time analyzing the data to find all of the errors and show a pattern of underreporting male compensation; having a deposition taken out of town (Garrison); producing thousands of pages of documents for

review and copying instead of providing copies of all of the documents as most lawyers do in most cases particularly with a small plaintiff and a government defendant; producing over 55,000 pages of mostly worthless emails with everything redacted except the date; producing boxes of disorganized and loose individual workload reports, most of which are missing, instead of the organized and systematic workload reports required by the law and by TSU's own written policies; and failing to follow other rules of discovery to harm the plaintiffs' cases, increase the costs of litigation unnecessarily, and limit or destroy the plaintiffs' chances of recovery.

3) Fails to abide by the law and its own written policy to create and maintain organized and analyzed (for fairness) TSU workload reports, instead providing as "workload reports" a smattering of law professor hand-written self-reports on what classes they are teaching and number of students enrolled, etc. that required the Plaintiff to spend dozens of hours to organize and analyze the (mostly missing) data.

4) Fails to answer discovery in a fair manner and raises ridiculous objections to valid questions directly relevant to the lawsuit in depositions and even directing TSU employees not to respond to

questions with no excuse or justification, causing disputes between counsel.

5) The pattern of abusive litigation tactics is a common form of retaliation against TSU employees who complain of civil rights violations and contributed to the incredibly hostile and intolerable working conditions at TMSL that led so many TMSL female employees to resign in recent years.

100. TSU employees continued to harass Plaintiff post-termination as well and continued to retaliate against her for bringing the lawsuit in *Sacks v. TSU I*. For example, after Plaintiff's resignation, she was blocked from accessing her financial records though TSU's system, TSU hid evidence from Plaintiff, and she was subjected to onerous run-arounds in tying up her 20-year employment with TSU.

## V.    CAUSES OF ACTION

<u>COUNT 1</u>
**Title VII Constructive Termination
Against TSU**

101. The preceding paragraphs are fully incorporated as if set forth fully herein.

102. TSU's conduct violates Title VII of the Civil Rights Act of 1964, which prohibits discrimination in employment on the basis of race and sex and also

prohibits retaliation and constructive termination for complaining about discrimination.

103.   Plaintiff is a racial minority at Texas Southern University and female. She has been subjected to harassment for years while in the law school or in the parking lot.  She filed an EEOC complaint and then a federal lawsuit in 2018.  The harassment became intolerable in 2019-2020 when a new dean arrived and greatly increased the workload of the female professors while failing to address the gross gender pay gap despite Equal Pay Act lawsuits pending against the law school. The Individual Defendants retaliated against the Plaintiff for filing the lawsuit after it was sent to all TMSL faculty via a law school global email.  TMSL ignored Plaintiff's complaints of discrimination and promoted Individual Defendants who aggressively harassed the Plaintiff.  TSU continued to fail to pay Plaintiff's wages and made clear that TSU had no intention of complying with the Equal Pay Act, other civil rights statutes, or the common law.

104.  The conduct became severe and pervasive to the point that it permeated every aspect of the Plaintiff's job including compensation, physical safety, access to/use of technology, class overload, and an overall much heavier work schedule with far less compensation than the men.  The harassment was motivated by race and gender and was sufficiently severe to be termed

"intolerable" by 2020 by any reasonable person's standards.  Three white TMSL female employees described the work environment as "intolerable."

105.  Plaintiff was forced to resign in 2020 due to the intolerable and abusive work environment and TSU's ongoing refusal to abide by civil rights laws while consistently creating false evidence to defend the many employee lawsuits.

106.  Plaintiff has suffered damages as a result of the retaliatory termination, including lost wages and other employment benefits as a result of employment termination. TSU is liable for constructive termination and Plaintiff's damages.

107.  Plaintiff timely met all filing prerequisites and filed this lawsuit timely.

**COUNT 2**
**Fair Labor Standards Act Constructive Termination**
**29 USC Sec. 215(a)(3)**
**Against All Defendants**

108.  All preceding paragraphs are fully incorporated as if set forth fully herein.

109.  Defendant TSU's misconduct and the Individual Defendants' misconduct violates the Fair Labor Standards Act anti-retaliation provisions, which provide for individual liability against ***any person*** who furthers a retaliatory scheme subsequent to an Equal Pay Act complaint, in addition to employer liability.

110.   Plaintiff participated in protected activities and lodged both informal and formal EEOC complaints and a lawsuit concerning the Equal Pay Act violations, hostile work environment and, discriminatory and harassing treatment. Thereafter, the Individual Defendants and TSU retaliated against Plaintiff and forced Plaintiff to resign her tenured position as described more fully herein above.

111.   Defendants' behavior that necessitated Plaintiff's resignation caused substantial damages, including unpaid wages of more than $300,000.00, lost wages post-termination, and large retirement account losses.

112.   The Individual Defendants acted with malicious intent and abused their state power, subjecting them to punitive damages.

113.   The Individual Defendants and TSU are jointly and severally liable for all of Plaintiff's damages because they acted intentionally and in concert, and Plaintiff's damages are indivisible.

## COUNT 3

### 42 U.S.C. Section 1983 Civil Rights Violations
### (Predicated on 42 U.S.C. Section 1981, the Equal Protection Clause, and the Due Process Clause)
### Against All Individual Defendants

114.   The preceding paragraphs are fully incorporated as if set forth fully herein.

115.   Pursuant to 42 U.S.C. Section 1983, Plaintiff may bring a claim for damages and injunctive relief for Individual Defendants' violation of Plaintiff's

rights secured by the Constitution or federal law, including rights secured by the Equal Protection Clause, the Due Process Clause, and 42 U.S.C. Sec. 1981.

116. 42 U.S.C. Section 1981 is a federal law that prohibits racial discrimination, harassment, and retaliation with respect to the making, performance, modification and termination of contracts, and the benefits, privileges, terms and conditions of the contractual relationship. The constitutional clauses protect Plaintiff from the loss of her employment based on intolerable racial and gender harassment and retaliation for complaining about it. Plaintiff had a property interest in her tenured professorship.

117. Individual Defendants have acted under color of state law. They have abused their power as government employees and they have subverted official TSU processes for their personal, malicious racist and misogynist purposes, in violation of the clearly established law.

118. Individual Defendants have taken the action they have based on racial animus and misogyny, have misused their official powers delegated to them by TSU/TMSL knowing that their conduct violates clearly established law prohibiting racial and gender discrimination. This conduct renders punitive damages proper.

119. TSU ratified this conduct and encouraged it against women and whites in particular. TSU violated TSU's own faculty manuals that set forth due

process for discrimination complaint and in fact promoted blacks who discriminated against others.

120.   As a result of Individual Defendants' violations of Plaintiff's clearly established rights federal statutory and constitutional rights, she has suffered lost pay and benefits, and other injury.

**COUNT 4**
**Breach of Contract**
**Against TSU**

121.   The preceding paragraphs are fully incorporated as if set forth fully herein.

122.   TSU was obligated by official salary letters to pay Plaintiff in accordance with the salary letters.  TSU failed to pay the Plaintiff and withheld tens of thousands of dollars owed to the Plaintiff in breach of its agreement to pay.

123.   Plaintiff performed all of her employment obligations and exceeded all expectations at TSML by holding additional classes for her students, creating original teaching materials, and publishing high-quality scholarship above and beyond the law school's expectations or requirements.

124.   Plaintiff presented a claim for her contract damages pursuant to Texas CPRC, Chapter 38, but TSU failed to tender payment before the expiration of 30 days, entitling Plaintiff to an award of attorneys' fees pursuant to Chapter 38.

125.   As a result of TSU's breach, Plaintiff has suffered damages in an amount to be proven at trial and attorney's fees in pursuing the claim.

## VI.   CONDITIONS PRECEDENT

126.   All conditions precedent to Plaintiff's claims for relief have been performed or have occurred.

## VII.   DEMAND FOR JURY TRIAL

127.   Plaintiff, DEANA POLLARD SACKS, asserts her rights under the Seventh Amendment to the U.S. Constitution and other federal law, and demands a trial by jury on all issues in accordance with Federal Rule of Civil Procedure 38.

## VIII.  CONCLUSION AND PRAYER

WHEREFORE, Plaintiff prays that as follows:

On The First Cause of Action

a)   For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, unpaid wages, front pay and other lost benefits of employment;

b)   For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

c)   For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

d)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law; and

e)      For such other and further relief as the court deems just and proper.

On The Second Cause of Action

a)      For an award of damages to compensate Plaintiff for her economic losses, including back pay, unpaid wages, lost wages, front pay, and other lost benefits of employment;

b)      For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

c)      For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

d)      For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law;

e)      For an award of punitive damages against each Individual Defendant; and

f)      For such other and further relief as the court deems just and proper.

On The Third Cause of Action

a)      For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, unpaid wages, and other lost benefits of employment, as well as special compensatory damages;

b)   For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

c)   For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

d)   For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law;

e)   For an award of punitive damages against each Individual Defendant; and

f)   For such other and further relief as the court deems just and proper.

On The Fourth Cause of Action

a)   For an award of damages to compensate Plaintiff for her economic losses, including back pay, lost wages, unpaid wages, and other lost benefits of employment, as well as special compensatory damages;

b)   For an award of pre-judgment interest on the amounts owed at the maximum rate allowed by law;

c)   For an award of costs of this action, together with reasonable attorneys' fees and expert witness fees;

d)   For an award of post-judgment interest on the amount of judgment until paid at the maximum rate allowed by law;

e)   For such other and further relief as the court deems just and proper.

January 28, 2022                      Respectfully submitted,


                                     /s/ David J. Sacks
                                     David J. Sacks
                                     SACKS LAW FIRM
                                     State Bar No. 17505700
                                     Federal Bar No. 6095
                                     2323 S. Shepherd, Suite 825
                                     Houston, TX 77019
                                     david@sackslawfirm.com
                                     Telephone:   (713) 863-8400
                                     Facsimile:   (713) 863-0502
                                     Attorney for Plaintiff